**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Criminal Action No. 21-102 (JDB)** |
| **MICHAEL ROBERSON,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

The Fifth and Sixth Amendments to the United States Constitution guarantee a panoply of critical rights to criminal defendants, among them the right against self-incrimination and the right to counsel. These Amendments also impose several concomitant procedural obligations on law enforcement, including the requirement that confessions be "voluntary" rather than coerced by police and, most famously, the rule that a suspect in custodial interrogation must be apprised of, and then must voluntarily, knowingly, and intelligently waive, his "<u>Miranda</u> rights."[1] These rights represent our system's promise of equal justice under law, and their accompanying procedural protections are "bulwark[s] against the coercive power of being taken into police custody and interrogated." <u>United States v. Burden</u>, 934 F.3d 675, 160 (D.C. Cir. 2019).

In the instant motion, defendant Michael Roberson alleges multiple violations of the aforementioned constitutional protections during four different encounters with federal agents. <u>See generally</u> Mot. to Suppress ("Def.'s Mot") [ECF No. 22]. Accordingly, he seeks to suppress his statements in those interviews and the results of a search of his cell phone. But Roberson's shotgun

---

[1] This, of course, is a misnomer—<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), did not create the <u>rights</u>, only the procedural obligation that police inform an interviewee of them before engaging in custodial interrogation.

blast of constitutional argumentation ultimately fails.  For the reasons explained below, the Court will deny Roberson's motion to suppress in full.

## Background

Beginning in 2017, federal agents with Homeland Security Investigations ("HSI") investigated an online distribution network for child pornography based out of Norfolk, Virginia. Suppression Hr'g Tr. ("Tr.") 2:12–24.[2]  In the course of this investigation, HSI agents uncovered several email communications from an email address later identified as belonging to defendant Michael Roberson.  Id. at 2:25–3:9.  These communications discussed the correspondents' sexual interest in children, and one message included a video depicting the sexual abuse of a prepubescent girl.  Id. at 3:4–15.  HSI Special Agent Ray Abruzzese began investigating these particular communications and, eventually, Roberson.

Abruzzese made contact with Roberson for the first time on March 7, 2019, outside of a Boys & Girls Club in Northeast Washington, D.C., where Roberson taught a dance class for children.  Id. at 3:21–4:10.  Roberson spoke with Abruzzese and two other HSI agents for approximately one hour, a conversation the Court refers to as "Interview 1."  During this encounter, Roberson consented to the agents searching his phone using a technique called "imaging."  The next week, Roberson and Abruzzese had two follow-up conversations via telephone: they spoke for twenty minutes on March 11 ("Interview 2"), and on March 12 they spoke again for around eighty minutes ("Interview 3").

On February 9, 2021, Roberson was indicted by a federal grand jury in the District of Columbia on one count of distributing child pornography in violation of 18 U.S.C. § 2252(a)(2) and (b)(1).  See Indictment [ECF No. 1].  After learning that a warrant had been issued for his arrest,

---

[2] The Court will cite and quote from a rough transcript of the October 28 suppression hearing.  When finalized, a transcript of this proceeding will be posted to the docket.  Due to the process of finalization, discrepancies between the rough transcript and the final version may exist.

Roberson turned himself in on February 25, 2021.  See id. at 87:4–11.  Shortly thereafter, Abruzzese and Detective Tom Sullivan of the D.C. Metropolitan Police Department interviewed Roberson at a police precinct for approximately one hundred minutes ("Interview 4").

On October 7, 2021, Roberson timely moved to suppress all of his statements from these four interviews, as well as the evidence acquired from the agents' imaging of his phone.  In particular, Roberson contends that:

- His statements in all four interviews were "involuntary" and thus may not be admitted against him for any purpose, Def.'s Mot. at 1–3;

- Interviews 1 through 3 ("the 2019 Interviews") constituted "custodial interrogations" for purposes of the Miranda doctrine, such that Abruzzese's failure to provide Miranda warnings mandates suppression of Roberson's statements in those interviews, id. at 16, 18–19;

- The contents of his cell phone constitute testimonial statements which were also "involuntary" under the Due Process Clause, id. at 31–32;[3] and

- He did not voluntarily, knowingly, and intelligently waive his rights in Interview 4, requiring suppression of those statements, id. at 28–30.

The government timely filed a response opposing Roberson's claims, see generally Gov't's Mem. in Opp'n to Def. Mot. ("Gov't Opp'n") [ECF No. 24], and on October 28, 2021, this Court held an evidentiary hearing in which both Abruzzese and Roberson testified.  In addition to that testimony, Roberson submitted recordings of all four interviews with his motion, see Def.'s Mot. App'x 4; Notice [ECF No. 23], which the parties agree are properly before the Court as joint exhibits, Tr. at 92:15–93:1.[4]  The motion is fully briefed, and the Court has had ample opportunity to review the evidence—the motion therefore is now ripe for decision.

---

[3] Although Roberson consented to the search of his cell phone during Interview 1, he and Abruzzese discussed the nature of that consent in Interviews 2 and 3 as well.  For this reason, the Court will discuss the voluntariness of the cell phone evidence after its discussions of the 2019 Interviews.

[4] When citing these recordings, the Court will follow the form "Int. # at #:##."  Any quotations are the Court's own best effort at transcription.

## Legal Standards

### I. Voluntariness

The Due Process Clause forbids the admission of a confession "if under the totality of the circumstances it was involuntarily obtained." United States v. Reed, 522 F.3d 354, 358–59 (D.C. Cir. 2008) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)). "The ultimate question is whether [a defendant's] 'will' was 'overborne and his capacity for self-determination critically impaired' as a result of the agents' conduct." United States v. Hallford, 816 F.3d 850, 857 (D.C. Cir. 2016) ("Hallford I") (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225–26 (1973)). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause . . . ." Colorado v. Connelly, 479 U.S. 157, 167 (1986). As such, "[a]lthough the defendant's mental condition can be a factor in the 'voluntariness calculus,' 'this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry.'" Reed, 522 F.3d at 359 (cleaned up) (quoting Connelly, 479 U.S. at 164).

To determine whether a statement was made voluntarily, "an inquiring court must conduct the juridical equivalent of an archeological dig into the whole of the circumstances." United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011). "Pertinent factors in this totality-of-the-circumstances analysis include the defendant's 'age, education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning.'" United States v. Avitan, 349 F. Supp. 3d 23, 31 (D.D.C. 2018) (quoting United States v. Murdock, 667 F.3d 1302, 1305–06 (D.C. Cir. 2012)). But in general, "'egregious facts [are] necessary to establish that the statements . . . made during questioning [are] involuntary,'" and "[s]tatements made where the circumstances are less than 'egregious' are usually voluntary." Hallford I, 816 F.3d at 863 (Wilkins, J., dissenting in part and

concurring in part) (alterations in original) (quoting United States v. Mohammed, 693 F.3d 192, 198 (D.C. Cir. 2012)).

## II.    **"Custodial" Interrogation**

"Miranda warnings are required 'where a suspect in custody is subjected to interrogation.'" United States v. Vinton, 594 F.3d 14, 26 (D.C. Cir. 2010) (quoting Rhode Island v. Innis, 446 U.S. 291, 300 (1980)); see also Miranda v. Arizona, 384 U.S. 436, 477 (1966) ("The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way.").  Whether an individual is "in custody" for Miranda purposes is a two-step inquiry, ultimately asking whether "the circumstances of the questioning 'present a serious danger of coercion.'"  United States v. Cooper, 949 F.3d 744, 748 (D.C. Cir. 2020) (quoting Howes v. Fields, 565 U.S. 499, 508–09 (2012)).  The first step of this analysis asks a familiar question: whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave."[5]  United States v. Hallford, 756 F. App'x 1, 6 (D.C. Cir. 2018) (per curiam) ("Hallford II") (quoting Howes, 565 U.S. at 509).  "That 'reasonable person' is not the defendant, but the average person innocent of any crime."  United States v. Lea, 839 F. App'x 551, 553 (D.C. Cir. 2020) (per curiam) (citing United States v. Goddard, 491 F.3d 457, 460 (D.C. Cir. 2007) (per curiam)); accord Florida v. Bostick, 501 U.S. 429, 438 (1991).  "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or

---

[5] An essentially identical test is used to determine if a person has been "seized" for purposes of the Fourth Amendment.  E.g., United States v. Lea, 839 F. App'x 551, 555 (D.C. Cir. 2020) ("Although identifying a seizure and custodial interrogation are distinct inquiries, if a citizen-police interaction was consensual because a reasonable person in the individual's position would have felt free to terminate the encounter, then the individual was not in custody for purposes of the Fifth Amendment.").  The Court will thus rely on principles and precedents from both contexts in determining whether Roberson was "in custody" during the 2019 Interviews.

absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." Howes, 565 U.S. at 509 (cleaned up).

Even if a reasonable person would not have felt free to terminate the encounter, the court's task is not done: it "must then ask 'the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda.'" Cooper, 949 F.3d at 748 (quoting Howes, 565 U.S. at 509). These kinds of "coercive pressures" include "the shock of being arrested and questioned after being yanked from familiar surroundings in the outside world and cut off from his normal life and companions; the hope that speaking will allow the interviewee to leave and go home; and a reason to think that the interrogating officers have authority to affect the duration of the interviewee's confinement." Hallford II, 756 F. App'x at 6 (cleaned up) (quoting Howes, 656 U.S. at 511–12). Both steps are "objective inquir[ies]," with the result that "'subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant." Id. (quoting J.D.B. v. North Carolina, 564 U.S. 261, 270–71 (2011)).

## III.   <u>Waiver of Rights</u>

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [Miranda] rights' when making the statement." Berghuis v. Thompkins, 560 U.S. 370, 382 (2010) (alteration in original) (quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979)). The burden "rests on the government to demonstrate that the defendant knowingly and intelligently waived" his rights, Miranda, 384 U.S. at 475, and the Supreme Court has since held that "[w]henever the [government] bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our Miranda doctrine, [it] need prove waiver only by a preponderance of the evidence," Connelly, 479 U.S. at 168; see also United States v. Harris, Crim. A. No. 19-358 (RC), 2021 WL 1167263, at *3 (D.D.C. Mar. 26, 2021)

6

("To overcome a motion to suppress, the government must prove by a preponderance of evidence that a defendant's waiver of <u>Miranda</u> rights was voluntary, knowing, and intelligent.").

A valid <u>Miranda</u> waiver may be either explicit or implicit, <u>Berghuis</u>, 560 U.S. at 382–83, but it must always be both "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived." <u>Id.</u> (quoting <u>Fare v. Michael C.</u>, 442 U.S. 707, 725 (1979)). Further, the government must make an "additional showing" that the waiver was knowing and intelligent; it may not rely merely on a demonstration "that a <u>Miranda</u> warning was given and the accused made an uncoerced statement." <u>Berghuis</u>, 560 U.S. at 384; <u>see also</u> <u>Tague v. Louisiana</u>, 444 U.S. 469, 470–71 (1980) (rejecting presumption that a defendant understood warnings and suppressing statements when "no evidence at all was introduced to prove that petitioner knowingly and intelligently waived his rights before making the inculpatory statement"). An interviewee need not, however, have a law professor's understanding of his rights: "It is only when the evidence in the case shows that the defendant could not comprehend even the most basic concepts underlying the <u>Miranda</u> warnings that the courts have found an unintelligent waiver." <u>Collins v. Gaetz</u>, 612 F.3d 574, 588 (7th Cir. 2010).

<u>**Analysis**</u>

**I.   <u>Interview 1</u>**

Interview 1, the first communication between Roberson and Abruzzese, took place at the Boys & Girls Club ("BGC") in Northeast D.C., where Roberson taught a dance class for children. Abruzzese arrived before Roberson, and he spoke to three BGC staff members to confirm the class

schedule and to ask to use a conference room for his interview with Roberson. Tr. 4:11–20. In the course of this conversation, he indicated that he was a federal agent investigating child exploitation and stated that he wished to speak to Roberson. Id. at 32:21–33:1. The BGC staff denied him permission to use the conference room, and so Abruzzese waited for Roberson outside the entrance. Id. at 7:19–21. When Roberson arrived later that day, Abruzzese and his partner, Special Agent Jeff Collins, went up to him as he approached the BGC, displayed their badges, and identified themselves as federal agents. Id. at 9:5–13. Both agents were armed but in plain clothes, id. at 8:7–17—Roberson saw Abruzzese's firearm on his belt, id. at 66:12–15, but both Roberson and Abruzzese agreed that the agents never brandished or even touched their weapons, id. at 8:16–9:4, 66:16–17. Roberson was not restrained in any way during this initial encounter. Id. at 10:4–13.

The agents had a brief conversation with Roberson outside the BGC, indicating that they wished to speak with him regarding an ongoing investigation. See id. at 11:1–3. Due to the presence of onlookers, Abruzzese then asked Roberson if he would be willing to continue the conversation in the agents' car, which was parked a short walk away in the building's back parking lot. Id. at 11:10–15. Roberson indicated his assent, and the three men walked together to the parking lot, id. at 11:16–12:1—at no time did the agents touch or restrain Roberson, id. at 12:2–6.[6] Once they reached the car (a four-door sedan), Roberson sat in the front passenger seat, Abruzzese sat in the driver's seat, and Collins joined a computer forensics agent in the back seat. Id. at 39:1–11. Abruzzese told Roberson that he was not under arrest, id. at 66:3–6, and he initiated an audio recording of the interview.

---

[6] Roberson gave a somewhat different account of their trip to the car, stating that the agents "escorted" him to the parking lot, that Abruzzese touched his arm to guide him, and that Roberson made some sort of resistance, though he acknowledged that the agents did not "force him" to go to the car. Tr. 65:11–66:2. In light of several other misstatements and dubious assertions about Interview 1 (discussed further below), as well as the Court's general assessment of Roberson's credibility as compared to Abruzzese's, the Court credits Abruzzese's testimony that the movement to the car was voluntary, not accompanied by any force, and lacked any noticeable resistance by Roberson.

Abruzzese asked Roberson standard background questions before turning to Roberson's social media usage and then to the email communications at issue in this case.  Roberson offered fulsome answers to these questions.  E.g., Int. 1 at 8:45–12:30.  Around twenty-five minutes into the encounter, Abruzzese asked if the agents could "image" Roberson's phone, see Int. 1 at 21:53–22:10: Roberson asked several questions about the process and scope of the search but eventually agreed, signing a consent form to that effect.  Id. at 22:22–25:50; Def.'s Mot. App'x 1.  During the imaging process, Abruzzese, Collins, and Roberson stood outside in the parking lot; the agents asked a few investigatory questions but principally made small talk with Roberson.  Id. at 26:00–50:20.  At several points, Abruzzese told Roberson that he could go inside to check on his dance class, id. at 28:15–:30, 42:20–:32, and around forty-five minutes into the encounter, Roberson did indeed briefly go inside the Boys & Girls Club, id. at 42:30–44:45.

Once Roberson's phone had been imaged, Abruzzese told Roberson that he could leave if he wanted to and then asked him about the illicit video sent from his email address.  Id. at 52:00–54:15.  Roberson briefly tried to explain, but, as the interview approached the hour mark, he then asked to leave, promising that the agents could call him and heading back inside the BGC.  Id. at 56:25, 57:20–:40.

### a.  **Voluntariness**

Roberson contends that his statements during Interview 1 were involuntary and thus may not be admitted against him for any purpose.  The question, then, is whether, in the totality of the circumstances, Roberson's will was overborne and his capacity for self-determination critically impaired as a result of egregious and coercive police conduct.  The Court finds that it was not.

None of the five factors listed by the D.C. Circuit in United States v. Murdock—the defendant's "age and education, the length of detention, whether the defendant was advised of his

rights, and the nature of the questioning," 667 F.3d at 1305–06—offer Roberson's claims meaningful support. His age and education militate against him—Roberson was twenty-seven years old and had a high school education, Int. 3 at 4:00–5:15; Tr. 56:17–18—and, though he was not advised of his rights (which was not required, as explained below), the interview lasted an hour at most, nearly twenty minutes of which was spent engaging in friendly small talk with the agents. The D.C. Circuit has repeatedly deemed statements resulting from longer and/or more coercive interrogations to be voluntary. E.g., Mohammed, 693 F.3d at 198 (statements during two-hour interview after the interviewee had been blindfolded and driven to an unknown location were voluntary); United States v. Yunis, 859 F.2d 953, 961 (D.C. Cir. 1988) (statements given over four days of questioning while interviewee was seasick in a hot and cramped room were voluntary).

Far and away the most important factor in the Court's determination here is the "nature of the questioning." In short, Roberson and the agents had a generally calm, friendly, and collaborative conversation, and Roberson "exhibited no signs [of] emotional or physical distress and was responsive to the officers' questions," Harris, 2021 WL 1167263, at *2. Abruzzese testified that Roberson was able to understand him, was not impaired, and was not "distraught or freaked out," with one exception.[7] Tr. 14:2–18. From its own review of the audio recording, the Court agrees with this assessment: Roberson sounds relatively at ease throughout the interview, and he was courteous and friendly with the officers, who were calm and polite in return.[8] Abruzzese's questioning was

_____

[7] Around ten minutes into the interview, Abruzzese asked about some of Roberson's prior involvement in social media "movements" regarding children's behavior online, and Roberson lost his composure in response. Int. 1 at 8:20–:50. But Roberson's emotional outburst sounds like one of disbelief at what he understood to be allegations of wrongdoing against some of his former associates, not anger toward the agents or any kind of general mental anguish. Indeed, after explaining these "movements" for a couple minutes, Roberson calmed down and the interview resumed its casual and courteous tone.

[8] See, e.g., Int. 1 at 8:11–:17 (Abruzzese: " I appreciate your time, and I know you gotta get [to your dance class] and I'm gonna try to move this along."); id. at 21:17–:23 (Abruzzese: "See, here's the deal . . . I – I know that a lot of people . . ." Roberson: "I know it's a lot; go ahead and release it."). Roberson also gave out his address and contact information at the beginning and end of the interview with no apparent trepidation. See Int. 1 at :25–:50, 51:08–:55.

"not the least bit aggressive in content, tone, or body language," United States v. Kelsey, 917 F.3d 740, 751 (D.C. Cir. 2019), and "[t]he tone of the interview was cordial . . . and the defendant was not deprived of any essentials," Hughes, 640 F.3d at 438–39.  Roberson made jokes with and at the expense of the agents,[9] and while waiting for his phone to be imaged, the group's casual conversation is reminiscent of new acquaintances chit-chatting at a social gathering rather than a police interrogation.[10]

Roberson told a different story at the suppression hearing: one of a terrified and panicking interviewee compelled to speak.[11]  He also claimed that he felt railroaded by Abruzzese, that he was being forced to say certain things, and that Abruzzese put words in his mouth.[12]  In his motion, Roberson claimed that he was "in fear of losing his job" during the interview, Def.'s Mot. at 9, 10, further suggesting at the hearing that the agents acted wrongfully by approaching him at the Boys & Girls Club, see Tr. at 30:2–31:15.[13]

---

[9] See, e.g., Int. 1 at 24:17–:20 (after the agents explained the process of imaging the phone, Roberson asked "Can I watch you go through my phone . . . sike, I'm just playing."); id. at 28:13–:17 (while waiting on search of the phone, Roberson said to Abruzzese "I ain't going nowhere, I can't run—I'm fat" in a playful tone of voice); id. at 54:01–:03 (Roberson called Abruzzese "flashlight" in a mocking tone of voice, a reference either to him not being "bright," his being a law enforcement officer, or his baldness).

[10] Int. 1 at 32:45–:58 (regarding the agents looking at the pictures on his phone, Roberson joked "All you're gonna see is me . . . ugly pictures of me and pictures of my dancers," and he jokingly suggested that the agents upload the pictures to social media so that his dance troupe could get additional publicity); id. at 33:15–22 (an agent asked defendant about his fiancee, and Roberson confided that she was "driving [him] crazy" and said, "I don't know if I'm ready for [marriage]!").  Though it is difficult for cold transcriptions to accurately convey the tone of a conversation, the above examples should give a flavor of the kind of questioning Roberson now contends was "egregious" and "coercive."

[11] Tr. 47:22–25 (Roberson testifying that, when he got in the car, he became "real nervous and my whole body is shaking, and all this stuff is going on at once and my mind is racing."); id. at 48: 15–18 ("I was afraid. I was scare[d]. Because I was like, [if] I tell him I don't want to talk, [then] I might get arrested[,] I might get in trouble[.] I'm in fear . . . ." ); id. at 70:18–20 ("I felt like I was being forced to say certain things or I would lose my dance company [or] I would have to face all this time in prison if I didn't say what he wanted me to say.")

[12] See, e.g., Tr. 62:13–15 ("[H]is voice changed I guess when I wasn't answering the questions [how] he wanted me to answer"); id. at 70:16–20 ("I felt like I was being forced to say certain things or I would lose my dance company [or] I would have to face all this time in prison if I didn't say what he wanted me to say."); id. at 71:2–3 (Attorney: "It's your testimony that [Abruzzese] did tell you what to say [in Interview 1]?" Roberson: "Yes, sir.").

[13] Defendant also suggests that Abruzzese's prior conversation with BGC staff and Roberson's mention of his abuse as a child played into the involuntariness of Roberson's statements.  Def.'s Mot. at 9.  Neither of these contentions holds up.  Statements made before Roberson arrived and of which he was unaware are irrelevant to whether his will was "overborne."  Cf. Moran, 475 U.S. at 422 ("Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right.").  And

In the words of sportscaster Warner Wolf, "let's go to the tape": Roberson's account is flatly contradicted by the recording of the interview.  In short, if Roberson was truly so afraid as to have his will completely overborne by the officers' polite questions, he did an excellent job of hiding it. Although Roberson did express (justifiable) anxiety about the impact of the agents' investigation on his dance program, see Int. 1 at 52:25–:35, 56:21–:32, his statements to that effect do not evince anything approaching a critically impaired capacity for self-determination.  Roberson may very well have been uneasy in this interview—apprehension is a natural response when unexpectedly approached by law enforcement officers.  But run-of-the-mill nervousness is insufficient to render subsequent statements "involuntary" in the constitutional sense.

Even if Roberson was in some kind of mental distress during the interview, a defendant's mental state alone cannot render a statement "involuntary" without "the crucial element of police overreaching."  Connelly, 479 U.S. at 163.  The Court finds no such overreaching here.  Contrary to Roberson's testimony at the suppression hearing, see Tr. 70:16–71:3, Abruzzese never told him what to say, nor did he threaten him with jail time if he failed to tell the agents what they wanted to hear. And the Court sees nothing improper—not to mention egregious—about the agents' choice to interview Roberson at the BGC in light of Abruzzese's inability to locate an address for him, id. at 4:1–10, 7:1–7, and the agent's discretion in not disclosing any unnecessary details to BGC staff, id. at 4:21–5:7, 33:16–22.

Finally, Roberson points to the fact that the interview took place in the agents' car as a reason his statements were involuntary.  See Def.'s Mot. at 9, 10.  Although being in a confined space with three law enforcement officers could easily engender feelings of unease, this interview occurred in daylight hours, in a semi-public location, and without the use of any restraints.  Courts have held that

---

neither Roberson, his counsel, nor the recordings provide any indication as to how any unfortunate history of abuse interfered with Roberson's ability to answer questions voluntarily.

statements made in analogous (and arguably even more coercive) situations were voluntary.  See, e.g., United States v. Magallon, 984 F.3d 1263, 1284–85 (8th Cir. 2021) (finding statements given after arguable promises of leniency during three sessions of questioning totaling 45 minutes while defendant was handcuffed in back of patrol car were voluntary).  In light of the other evidence suggesting a cooperative and voluntary interaction, the mere location in the agents' car is not sufficient to transform the interview into unconstitutional coercion.

In sum, the totality of the circumstances demonstrates that Roberson's statements in Interview 1 were not products of an overborne will caused by egregious and coercive police conduct: his statements were voluntary.

### b.  **Custody**

The next question is whether Interview 1 was a "custodial interrogation" requiring the provision of Miranda warnings.  That is, would "the average person innocent of any crime," Lea, 839 F. App'x at 553, have felt free to leave this interview and, if not, did the situation "present[] the same inherently coercive pressures as the type of station house questioning at issue in Miranda"?  Howes, 565 U.S. at 509.  In answering the first question, courts consider, among other things, "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning."  Id. (internal citations omitted).

Interview 1 lasted approximately one hour, but the truly interrogative part of the encounter lasted only around forty minutes.  Such a short duration does not support a finding of custody.  See, e.g., Howes, 565 U.S. at 503, 514–15 (finding five-to-seven-hour interview continuing past midnight

to be non-custodial).  Likewise, Roberson was not restrained during the interview,[14] nor was he under

arrest either during or afterwards.  See, e.g., Tr. 13:9–12.

The Court heavily weighs the "statements made during" Interview 1.  Howes, 565 U.S. at 509.

One critical statement to consider is whether the interviewee was told he was free to leave.  Although

this factor is not dispositive, see United States v. Mendenhall, 446 U.S. 544, 555 (1980), the fact

"[t]hat a person is told repeatedly that he is free to terminate an interview is powerful evidence that a

reasonable person would have understood that he was free to terminate the interview,"  United States

v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004); see also Howes, 565 U.S. at 517 (finding interview

was non-custodial and giving "especial[]" importance to "the undisputed fact that respondent was

told that he was free to end the questioning").

The Court has already discussed the friendly tone of the interview with respect to the

voluntariness inquiry, and this characteristic of the conversation also suggests that the interview was

not custodial.  Cf. United States v. Robinson, 256 F. Supp. 3d 15, 26 (D.D.C. 2017) (finding interview

non-custodial in part because "Defendant's demeanor was calm and patient throughout the

interview;" "[t]he interviewers' tones were also generally calm and conversational;" and "[n]o threats

or promises were made to Defendant").  Furthermore, it is undisputed that Abruzzese told Roberson

that he was not under arrest at the beginning of the interview.  Tr. at 12:16–13:6, 66:3–6.  Abruzzese

also testified that he "indicated to [Roberson] on several occasions before and during the interview

that he[] [was] free to go at any time," id. at 13:4–6, and that when they got to the car, he "made it

---

[14] At the suppression hearing, the parties disputed whether the sedan's doors were locked: Roberson testified that they were, Tr. 67:8–68:16, while Abruzzese testified that not only were the doors unlocked but that he told Roberson so, Tr. 12:18–24.  Roberson based his statement on the fact that, when he opened the door to get some fresh air, he heard the locks click, indicating that the agents had unlocked the door for him.  The recording, though far from clear, does not support this recollection—at least one door opened before the lock mechanism was activated.  Int. 1 at 19:05–:15.  Indeed, it appears more likely that the "click" Roberson heard was someone accidentally locking, rather than unlocking, the doors, since immediately afterwards Abruzzese told the other agents to "make sure the doors are not locked."  Id. at 19:12.  Either way, however, it is uncontested that the agents did not intend to have the doors locked and never used the door locks as a means of restraining Roberson's movement.

very clear that [Roberson] was free to leave and th[at] . . . if he wanted to get out of the car, he could

get out of the car at any time," id. 12:18–20.  Roberson, on the other hand, testified that he "wasn't

told [that he was free to leave] . . . at first," id. at 48:2, and that Abruzzese "never said" that he did

not have to answer any questions, id. at 68: 17–22.

As the government notes, Abruzzese told Roberson several times during the interview that he

could leave if he wanted to, Gov't Opp'n at 13–14, and Roberson did indeed go inside the BGC for a

few minutes during the interview, Int. 1 at 42:30–44:45.  But these admonitions prove less than the

government would like.  The recording does not capture Abruzzese telling Roberson that he may

leave until 28 minutes into the interview,[15] at which point the agents had already taken possession of

Roberson's phone in order to image it—in context, these statements likely conveyed only <u>temporary</u>

freedom to check on his dance class while the agents imaged his phone.[16]  It is not until 52 minutes

into the recording that Abruzzese unequivocally informs Roberson that, "if you're not interested in

hearing this, then you can obviously leave,"[17] which Roberson clearly took to heart, as only a few

minutes later he ended the interview.  See <u>United States v. McCormick</u>, Crim. A. No. 18-0359 (JDB),

2019 WL 6311898, at *5 (D.D.C. Nov. 25, 2019) (interview was non-custodial when interviewee was

told he was free to leave and then did so, demonstrating that he "did in fact feel free to 'terminate the

---

[15] There is one earlier discussion of defendant's freedom to leave, but it cuts both ways.  Roberson asked if he could go back to his dance class, to which Abruzzese replied, "Yeah . . . just give me like ten more minutes, I appreciate it," before proceeding to ask additional questions. Int. 1 at 18:35–:41. On the one hand, Abruzzese answered the question in the affirmative; on the other hand, he immediately appended a request that Roberson stay longer for more questions. It is hard to say, then, that a reasonable person would have understood this exchange as giving him permission to end the interview whenever he wanted.

[16] Int. 1 at 28:15–:30 (Abruzzese: "You can go wherever you want, I mean, if you want to pop your head in and explain to your class . . . and then come back out, that's fine."  Roberson demurred, and Abruzzese insisted: "You want to check and then come back out? . . . I don't want to keep you from your kids; you're certainly not obligated to stand here."); id. at 42:20 (Abruzzese: "If you want to go inside and check in with your dancers—we're not stealing your phone . . . .").

[17] Int. 1 at 52:00; <u>accord</u> id. at 56:35 (Abruzzese: "Michael, you are free to go inside whenever you want, I'm not holding you here.").

interrogation and leave'" (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995))).  In sum, the

statements made during the interview weigh against a finding of custody, though only moderately.[18]

Roberson's argument centers on the "location of the questioning": the agents' car in the

parking lot of the BGC.  See Def.'s Mot at 9, 10.  Roberson testified at the suppression hearing that

he was surrounded by agents in the car and felt "ganged up on," Tr. 79:18–19, i.e. that he was in a

"police-dominated atmosphere," a key feature of custodial interrogation.  See, e.g., United States v.

Richardson, 36 F. Supp. 3d 120, 127 (D.D.C. 2014).   This Court has previously held that an

interrogation in a police car is not automatically "custodial," see McCormick, 2019 WL 6311898, at

*5 (rejecting argument that "interviews in police cars are per se custodial interrogations"), and many

courts have found that interviews in similar circumstances were not "custodial,"  see, e.g., United

States v. Jones, 523 F.3d 1235, 1240–44 (10th Cir. 2008) (interview of between forty-five minutes

and one hour in unmarked car parked on public street with three officers present was not custodial

when interviewee voluntarily agreed to speak to police in the car, agents were in plain clothes and

never showed their firearms or other police equipment, and tone was "calm and conversational");

United States v. Butler, 790 F. App'x 782, 784 (6th Cir. 2019) (fifteen-minute interview with

defendant locked in back of patrol car was not custodial even though defendant was not told he was

free to leave because defendant was not handcuffed, was told he was not under arrest, and agreed to

speak to police in the car); see also McCormick, 2019 WL 6311898, at *5 (interview in a police car

---

[18] Roberson repeatedly testified that he felt that he was under arrest from beginning to end in Interview 1.  But "the 'subjective views harbored by . . . the person being questioned' are irrelevant" to whether a defendant was "in custody" for Miranda purposes.  J.D.B., 564 U.S at 271 (quoting Stansbury v. California, 511 U.S. 318, 323 (1994) (per curiam)).  In any event, Roberson's statements are difficult to credit: he testified that he still felt that he was under arrest each time Abruzzese told him he was free to leave and even after he terminated the interview and went back inside.  See Tr. 75:21–77:21, 79:6–11.  And although his requests to leave (as opposed to simply walking out), see Int. 1 at 56:25, 57:20, could indicate feelings of detention, see Robinson, 256 F. Supp. at 28, his contemporaneous statements that he "did not want to be rude," Int. 1 at 56:35; accord id. at 57:28–37, suggest that politeness, rather than legal compulsion, was his motivation for not walking out in the middle of the conversation.

was non-custodial when defendant was told that he was not under arrest and that he was free to leave at any time, was not restrained, and successfully terminated the interview on request).[19]

Accordingly, the Court concludes that Roberson was not "in custody" during Interview 1.  He was told he was not under arrest and may have been told more explicitly that he was free to leave at any time.  More generally, the conversation was friendly and collaborative; the encounter was not particularly long; Roberson was never meaningfully restrained; and he was released without any suggestion of arrest at the end of the interview.  These facts together suggest that a reasonable person would have felt free to terminate the interview and leave.[20]  Indeed, that is essentially what Roberson ultimately did.

Even if a reasonable person would <u>not</u> have felt free to leave during Interview 1, Roberson's situation did not implicate the kind of "inherently coercive pressures" as would a truly "custodial" interview.  <u>See</u> <u>Howes</u>, 565 U.S. at 509.  It would be a stretch to describe a short walk to an agent's car as being "yanked from familiar surroundings," <u>Hallford II</u>, 756 F. App'x at 6 (quoting <u>Howes</u>, 565 U.S. at 511), and sitting in an unlocked car (which Roberson exited multiple times) does not "cut [one] off from [] normal life," <u>id.</u>  Further, the tone of the interview undermines any claim that Interview 1 was the sort of psychologically disorienting interrogation about which the <u>Miranda</u> Court

_____

[19] As discussed above, there was nothing wrongful about conducting the interview at the BGC.  Roberson claims that doing so was "custodial" because he "could not just leave work, while he was supposed to be working."  Def.'s Mot. at 23.  But this is true of all police interrogations conducted at workplaces, a great many of which have been deemed non-custodial.  <u>See</u> Wayne LaFave et al., <u>Criminal Procedure</u> 825 & n.75 (4th ed. 2015) (collecting cases).

[20] The Court's conclusion is bolstered by Interview 1's close resemblance to the facts of <u>Mendenhall</u>, a leading case applying the free-to-leave test in the Fourth Amendment context.  In that case, the Supreme Court held that the defendant had not been seized <u>either</u> when two DEA agents approached and briefly questioned her on the public concourse of an airport, 446 U.S. at 555, <u>or</u> when they subsequently asked her to accompany them to a private room to continue the encounter, <u>id.</u> at 557–58.  The Court concluded that a reasonable person in defendant's position would have felt free to leave because she "was not told that she had to go to the office" but was only asked, "[t]here were neither threats nor any show of force," and she "had been questioned only briefly . . . before she was asked to accompany the officers."  <u>Id.</u>  Substitute "entrance to the Boys & Girls Club" for "public concourse" and "agents' vehicle" for "private room," and one arrives at a reasonably close approximation of the facts of this case.

was concerned.  Cf. Miranda, 384 U.S. at 448–55.  Thirty minutes of polite questioning in a car, twenty minutes of milling about outside, and five more minutes of voluntary questioning do not "inherently coercive pressures" make.

In sum, Roberson's statements in Interview 1 were not involuntarily compelled by egregious police coercion, nor was Interview 1 "custodial interrogation" such that Miranda warnings were required.  The Court will thus deny Roberson's motion to suppress those statements.

## II.   <u>Interview 2</u>

On March 11, 2019, four days after Interview 1, Abruzzese called Roberson's cell phone at around 3:45 in the afternoon.  Int. 2 at 20:42–:47.  Roberson answered the call after a few rings, and spoke to Abruzzese for approximately twenty minutes.  As he told Abruzzese shortly after answering the phone, Roberson was at work in a childcare position during this call.  Roberson also told Abruzzese that the BGC had decided to suspend his dance program while Abruzzese's investigation was ongoing—understandably, Roberson was upset about this decision, which he attributed to the agent's actions prior to Interview 1.  Int. 2 at 1:14–2:10.  Abruzzese denied giving out details of the investigation and promised that he had not told the Boys & Girls Club anything that would "jeopardize your situation there."  Int. 2 at 2:17–:23.[21]  The pair then revisited many of the same topics of discussion from Interview 1, with Abruzzese, in his own words, becoming "a little bit more aggressive to point out the fact that some of the information that [Roberson] was providing just didn't make any sense."  Tr. 21:9–11.  After around twenty minutes,  Abruzzese ended the interview by inviting Roberson to set up a time to continue the conversation, and Roberson indicated that he would likely call Abruzzese after work.  Int. 2 at 20:00–:25.

---

[21] In Interview 3, Abruzzese told Roberson what he told BGC staff: "What I told them was: I identified myself as a federal agent and I said that I am working on a child exploitation case and that I was looking to interview you regarding my investigation.  I didn't tell them any information that was directly involved with your case, but I identified the type of case I was working, which is true."  Int. 3 at 1:45–2:26.

18

### a. **Voluntariness**

As with Interview 1, Roberson claims that his statements in this twenty-minute phone call were not voluntary.  His principal contentions are that 1) he was at work at the time and 2) he was upset about the cancellation of his dance program at the BGC.  See Def.'s Mot. at 10–11.  The question is whether these two circumstances "critically impaired" Roberson's "capacity for self-determination" as a result of egregious or coercive conduct on the part of Abruzzese.  They did not.

Like Interview 1, Interview 2 was on the whole courteous and friendly.  To give a flavor, Roberson expressed his understanding that Abruzzese was "just doing [his] job," Int. 2 at 12:17–:19, while Abruzzese told Roberson that he believed his story, id. at 12:14, and that "there's always two, sometimes three sides to a story, and I'm very willing to hear your side, but I just need a little bit more from you," id. at 17:45–:48.  If anything, it was Roberson who was the dominant personality in this call, often talking for extended periods without interruption, e.g., id. at 4:00–5:00, and confronting Abruzzese in an accusatory and sarcastic tone about the agent's role in the suspension of his dance program, id. at 1:15–2:10 ("I was asking you what this meant for my program, and then I get a phone call . . . .").  The lack of coercion in this interview also comes through in Roberson's promise to call Abruzzese back soon.

To be sure, as Abruzzese acknowledged at the suppression hearing, the questioning towards the end of the interview became "a little bit more aggressive."  Tr. 21:9.  For instance, at one point Abruzzese told Roberson that his explanations were "kind of a difficult sell over here."  Int. 2 at 13:15–:22.  Yet at no time did Abruzzese's conduct approach a line of constitutional significance: he remained polite, if slightly more forceful; he did not raise his voice or put words in Roberson's mouth; and he did not threaten Roberson in any respect.  Roberson's assertion otherwise at the suppression

hearing—that Abruzzese "threatened that Roberson would lose his company," see Tr. 62:17; 63:25–64:3—is not accurate.

Contrary to Roberson's claim in his motion, Def.'s Mot. at 10, there is no evidence that Abruzzese knew that Roberson was working when he called on March 11.  Quite the opposite: Roberson had specifically told Abruzzese in Interview 1 that he did not usually work on Tuesdays. Int. 1 at 38:00–:25.  And even if Abruzzese had known, it is not unconstitutionally coercive for a law enforcement officer to interrupt someone's workday as part of a criminal investigation.  And although Roberson twice brought up the fact that he was at work, see Int. 2 at 3:50–4:00, 7:07–:10, he never indicated that he needed to hang up for that reason, and Abruzzese never told him to drop what he was doing to talk to him.  To the contrary, Abruzzese was accommodating when Roberson needed to pause the conversation to deal with work responsibilities.[22]

It is uncontested that Roberson was indeed upset about the cancellation of his program and that he expressed this feeling during the interview.  Yet it has never been explained why this development was so overwhelming that it robbed him of the capacity for rational decisionmaking, nor, upon review of the recording of this call, does the Court see any evidence that it did.[23]  In any event, the emotion Roberson may have felt because of this development is irrelevant, since a decision of the BGC is not "state action" in the absence of compulsion by federal agents, see Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1928 (2019) (citing Blum v. Yaretsky, 457 U.S. 991, 1004–05 (1982)), and thus cannot be the basis of a finding of involuntariness, see, e.g., Connelly, 479 U.S.

---

[22] At one point, a child ran into the room where Roberson was on the phone, and Roberson apologized to Abruzzese and asked him to hold on.  Abruzzese accommodatingly responded, "Yeah, no, I hear you," and waited while Roberson dealt with the child, at which point Roberson returned to the call without hesitation, apologized again, and the conversation continued.  Int. 2 at 6:04–:21.

[23] As with Interview 1, defendant characterized his mindset during this call as one of fear and panic, testifying that he thought "they were going to come pick me up," that he thought the officers "knew where I was," and that he "felt like I was entrapped at this point."  Tr. 49:17–19, 50:21–25.  The Court has its doubts about the credibility of these statements but, even assuming Roberson did feel this way, the Court concludes that his feelings were not caused by egregious and coercive police conduct.

at 171.  Abruzzese did not bring about the termination of Roberson's program,[24] and the agent's mere knowledge that Roberson's program had been cancelled, without any indication that Roberson's feelings precluded his exercise of free will on March 11, did not render continued questioning unlawful.  In the totality of circumstances, then, the Court finds that Roberson's statements in Interview 2 were voluntary.

###   b.  Custody

Except in only the most outrageous and extreme circumstances, speaking on the phone with a law enforcement officer is not "custodial."  See Pasdon v. City of Peabody, 417 F.3d 225, 227 (1st Cir. 2005) ("It is clear that Pasdon was not 'in custody' here: [the officer] asked him questions over the telephone."); State v. Halverson, 953 N.W.2d 847, 855 (Wis. 2021) ("To our knowledge, no court has concluded that a telephonic interrogation triggered Miranda custody."); see generally Wayne LaFave et al., Criminal Procedure 833 & n.110 ("A Court is not likely to find custody for Miranda purposes if the police were not even in a position to physically seize the suspect . . . . [a]s when the police-suspect communication is via telephone.").  There is nothing outrageous or extreme about the circumstances here—this twenty-minute phone conversation was not custodial interrogation.

Roberson testified at the suppression hearing that when Abruzzese called him, he "felt like they knew where I was;" that he felt "trapped," "in fear," and "in shock;" and that he "ha[d] to answer [Abruzzese's] call [and] . . . say what he asks me to say because" otherwise bad things might happen to him.  Tr. 49:15–19, 50:21–51:3.  Having reviewed the recording of this phone call, Roberson betrayed no anxiety or hesitation when Abruzzese introduced himself, nor was there any hint of "fear," "shock," or entrapment in the rest of the conversation.  Rather, Roberson almost immediately

---

[24] Defendant's suggestion to the contrary fails.  Even though Abruzzese's brief conversation may have been a but-for cause of the decision to suspend defendant's program, something more than this minimal showing of causality is needed to transform the BGC's decision into state action.

began talking freely to Abruzzese.  And even if Roberson did honestly feel that he was not free to ignore the call or to hang up, that feeling was not objectively reasonable: Abruzzese never demanded that he stay on the line, and the agent was accommodating to the needs of Roberson's job.[25]

## III.    Interview 3

The day after Interview 2, Roberson called Abruzzese's cell phone, and when the agent did not answer, Roberson left a voicemail message asking Abruzzese to call him back to "follow up" on their previous conversations.  Gov't Opp'n at 8; Tr. 22:18–19.[26]  Abruzzese called Roberson back at approximately 10:50 in the morning on March 12, 2019.  See Int. 3 at 1:23:26–:31.  Upon answering, Roberson asked Abruzzese more about what he had told the Boys & Girls Club, apparently in the hopes that his dance program could be reinstated.  Id. at 1:05–2:55.  Rather quickly, however, the conversation turned back to Roberson's emails.  Id. at 3:00–:15.  Abruzzese again went over Roberson's allegedly illicit correspondence and pressed him for an explanation, and Roberson again offered meandering, evasive answers, to which Abruzzese offered moderate resistance.  See generally Tr. 23:3–16.  At one point, Roberson mentioned a "disability," explaining that he graduated high school late due to attention deficit hyperactivity disorder, "behavioral issues," anxiety, and depression.  Int. 3 at 4:25–5:02.  In total, the conversation lasted around eighty minutes.

---

[25] Roberson, relying on Stansbury v. California, 511 U.S. 318 (1994), suggests that Abruzzese's telling defendant that his story was not believable contributed to the custodial nature of these interviews.  See Def.'s Mot. at 18.  But Stansbury focused on an officer telling an interviewee that he was a suspect instead of a witness and did not address Roberson's situation.  See 511 U.S. at 324–35.  Even if Stansbury can be read to support Roberson's proposition, Abruzzese's relatively gentle explanation of the inconsistencies in Roberson's story "would [not] have affected how a reasonable person . . . would perceive his . . . freedom to leave" this phone conversation.  Id. at 325.

[26] Although this message was recorded, it has not been provided to the Court.  The existence of the message is undisputed, and Roberson and Abruzzese referenced it in Interview 3.  E.g., Int. 3 at :38–:45, 13:43–:48.  The Court thus relies on the government's proffer of the message's contents, which has not been disputed by defendant and was corroborated by Abruzzese's testimony at the suppression hearing.

### a.  <u>Voluntariness</u>

As with the previous two interviews, Abruzzese engaged in no egregious, coercive conduct during Interview 3.  His tone of voice was generally calm, and even when he pushed back on Roberson's answers, he did so gently.  <u>E.g.</u>, Int. 3 at 12:45–14:10, 20:30–:45.  And rather than evincing fear or compulsion in the face questioning, Roberson repeatedly and at length tried to explain the communications at issue, often with long, scarcely-interrupted monologues.  <u>E.g.</u>, <u>id.</u> at 25:25–27:58.  None of the feelings of fear or compulsion about which Roberson testified, <u>see</u> Tr. 51:22–53:6, are evident on the recordings.

Roberson again claims that his statements were involuntary because Abruzzese "believed Mr. Roberson was upset" about the cancellation of his dance program when he called him.  Def.'s Mot. at 11.  Frankly, this contention makes no sense: <u>Roberson</u> initiated this interaction.  There is simply no evidence that Abruzzese intentionally exploited Roberson's distress, and, as noted above, any attempt to pin the termination of the dance program on the government fails.

Roberson also claims his statements were unlawfully compelled because he "told the agent[s] that he had [attention deficit hyperactivity disorder], behavioral issues, anxiety and depression." Reply in Supp. of Mot. to Suppress ("Def.'s Reply") [ECF No. 25] at 7.  It is true that Roberson did make such a statement to Abruzzese, but it was in the past tense, <u>see</u> Int. 3 at 4:25–5:02—neither his statements nor his conduct would have given Abruzzese any indication that he was suffering from serious mental impairment <u>during</u> Interview 3.[27]  Under such circumstances, continuing with questioning does not constitute egregious, coercive conduct.

---

[27] Roberson implied for the first time at the suppression hearing that he may have been drunk during this interview, a claim which appears to stem not from an actual memory of drinking but from the fact that "if [he] was home, maybe [he] probably [was]." Tr. 60:15.  Regardless, Roberson never gave any indication, either explicitly or through his behavior, that he was intoxicated during this interview.  As such, no "police overreaching" occurred, even if Roberson "maybe probably" had been drinking.

### b.  **Custody**

Interview 3 was not custodial.  In addition to being a phone conversation—a form of interrogation which almost never constitutes "custody"—it was <u>Roberson</u> who called Abruzzese and <u>asked</u> for the conversation.  "'[S]uspect-initiated contact' with law enforcement 'is not custody for <u>Miranda</u> purposes,'" <u>United States v. Tai Tan Nguyen</u>, 325 F. Supp. 3d 124, 127 (D.D.C. 2018) (alteration in original) (quoting <u>Schreane v. Ebbert</u>, 864 F.3d 446, 452 (6th Cir. 2017)), and the fact that a defendant "actively sought the interview . . . indicates that he was not in custody during the [requested] interview and is suggestive of the voluntary nature of [earlier interactions]," <u>id.</u>  And the mere fact that the conversation lasted for roughly eighty minutes, <u>see</u> Def.'s Mot. at 14, is far from sufficient to establish that the reasonable person would not have felt free to hang up the phone.

Roberson claims that when Abruzzese called him on March 12, he was "[s]till in fear," thinking that he "may be arrested" and that the police were "on the way to come get [him]."  Tr. 51:8–9.  But it is undisputed that Abruzzese was calling Roberson at his own request—Roberson's statements about his mental state on March 12 are thus not plausible.  Roberson tried to explain that he called Abruzzese only because he "felt like he had to," Tr. 83:19, but this too is not credible.  And regardless of whether Roberson actually had these thoughts, they were not objectively reasonable.  Hence, Interview 3 was not custodial.

### IV.  **Consent to Search Phone**

The Court now addresses the voluntariness of Roberson's production of his phone to police.  Roberson argues that the evidence gleaned from the agents' search of his phone constitutes testimonial evidence which was involuntarily compelled in violation of the Due Process Clause.  Def.'s Mot. at 31–32.  The Court disagrees, finding nothing involuntary or unconstitutional about the

24

search: Roberson's consent was validly and voluntarily given during Interview 1, and he did not withdraw that consent in subsequent interviews.

During Interview 1, Abruzzese and his team "imaged" Roberson's phone, essentially creating a perfect replica of the data on it.  Before commencing the imaging process, however, Abruzzese asked Roberson for permission: "The way I can [cross your name off the list] is by you allowing me to look at your phone real quick so I can clear it out and say 'there's nothing here, we're done.'"  Int. 1 at 22:10–:22.  Though cautious, Roberson responded, "well what do you want to see first," id. at 22:23, at which point the agents explained the process to him, with Roberson asking several clarifying questions about the scope of the search, id. at 22:30–24:30.  Roberson agreed, and Abruzzese gave him a form entitled "Computer Forensics Consent Worksheet" and encouraged Roberson to read it. Id. at 24:35–:40; see also Def.'s Mot. App'x 1.  Roberson signed the form, which read, in part, "I give this written permission voluntarily.  I have not been threatened, placed under duress, or promised anything in exchange for my consent.  I have read this consent worksheet and/or it has been read to me and I understand it."  Def.'s Mot. App'x 1; Int. 1 at 25:20–:48.  Roberson was also actively involved in the imaging process: without hesitation, he entered his phone's password when an agent asked him to, Int. 1 at 30:56–31:15, and a few minutes later, he asked the agents again, unprompted, if they needed his help, id. at 32:17–:25.

In Interviews 2 and 3, however, Roberson told Abruzzese that he did not read the consent form, Int. 2 at 4:05–:25, 9:40–:50; Int. 3 at 1:13:52–:14:00, and he implied that, if he had, he would not have been able to understand it, Int. 2 at 9:55–10:11; Int. 3 at 1:14:05–:50.  In response, Abruzzese again encouraged him to read the form and offered to scan him a copy,[28] explaining that by signing

---

[28] As Abruzzese acknowledged in Interview 3, he did not actually send Roberson the form after Interview 2.  Int. 3 at 1:19:45–:20:20.  He promised to text him a picture of the form after Interview 3, id., but on the record before the Court, it is not clear if he actually did so.

it, Roberson had given his consent to the search.  Int. 2 at 9:45–10:15.  And in Interview 3, Abruzzese

asked Roberson point-blank if he was "removing [his] consent," but Roberson, while maintaining that

he had not read the form, declined to withdraw his permission.  Int. 3 at 1:14:02–:18.  At Roberson's

request, Abruzzese began explaining what the consent form meant, but Roberson interjected,

suggesting that the form "gave [the agents] permission to look at my phone."  Int. 3 at 1:20:24–:28.

### a. <u>Analysis</u>

Roberson styles his arguments regarding the suppression of the contents of his cell phone as

a Fifth Amendment challenge to the voluntariness of testimonial statements.  <u>See</u> Def.'s Mot. at 31–

32.  On this view, the same standard the Court applied to Roberson's verbal statements also applies

to the information from his cell phone.  However, the Court notes that Roberson's challenge could

also be framed as a Fourth Amendment challenge to his consent to the search.  The touchstone of this

inquiry is also "voluntariness," and the application of this principle is the same regardless of which

Amendment supplies the ultimate rule of decision.  <u>See</u> <u>Schneckloth</u>, 412 U.S. at 229 ("Just as was

true with confessions, the requirement of a 'voluntary' consent reflects a fair accommodation of the

constitutional requirements involved. . . . In sum, there is no reason for us to depart in the area of

consent searches, from the traditional definition of 'voluntariness.'").  Accordingly, whether

understood as a challenge under the Fourth or Fifth Amendment, the Court's analysis—and ultimate

outcome—will be the same, and the Court will avail itself of precedent from both contexts in the

course of assessing Roberson's arguments for suppression.

The voluntariness of consent to search depends on "the totality of all the surrounding

circumstances," <u>Schneckloth</u>, 412 U.S. at 226, including "the consenting party's 'age, poor education

or low intelligence, lack of advice concerning his constitutional rights, the length of any detention

before consent was given, the repeated and prolonged nature of the questioning, and the use of

physical punishment,'" <u>United States v. Wilson</u>, 605 F.3d 985, 1027 (D.C. Cir. 2010) (quoting <u>United States v. Hall</u>, 969 F.2d 1102, 1107 (D.C. Cir. 1992)).   It is not necessary that a defendant be explicitly told that he has a right to refuse his consent, though that factor is relevant to the totality of the circumstances.   <u>Schneckloth</u>, 412 U.S. at 227.   The court's task is to "assur[e] the absence of coercion." <u>Id.</u>   In general, consent is deemed voluntary "where the [defendant] signed forms stating 'in clear and unambiguous language that [he] could deny the search at any time and affirm[ing] that [he was] not threatened, ordered or intimidated into submitting to the search.'" <u>Sherrod v. McHugh</u>, 334 F. Supp. 3d 219, 246 (D.D.C. 2018) (third alteration in original) (quoting <u>Fraternal Ord. of Police/Dep't of Corr. Lab. Comm. v. Washington</u>, 394 F. Supp. 2d 7, 14 (D.D.C. 2005)).

In March 2019, Roberson was twenty-seven years old with a high school education.   Int. 3 at 4:00–5:15; Tr. 56:17–18.   Although he has repeatedly referenced a "disability" interfering with his ability to comprehend written English, Tr. 55:17–19, 82:1–2, as well as a history of attention deficit hyperactivity disorder, <u>id.</u> at 73:16; Int. 3 at 4:45–:49, Roberson has presented no evidence of either ailment, and his statements at the suppression hearing and in the interviews assure the Court of Roberson's intelligence and mental capacity.   At the time that he produced his phone to the agents, Roberson was not in custody, and he had been subjected to neither "repeated and prolonged . . . questioning" nor "physical punishment." <u>Wilson</u>, 695 F.3d at 1027 (quoting <u>Hall</u>, 969 F.2d at 1107).   To the contrary, the agents sought his consent to search twenty minutes into a cordial interview: Abruzzese broached the topic of the search in a conciliatory, non-coercive way, <u>see</u> Int. 1 at 22:10, and the agent explicitly told Roberson that he did not have to sign the consent form, <u>id.</u> at 21:45–:50.[29]   Indeed, the Court has already found that Roberson's other statements in Interview 1 were

---

[29] This statement came before Abruzzese had even mentioned the search—Roberson noticed the form Abruzzese was holding and asked "I gotta sign this?" to which Abruzzese replied "no."   Int. 1 at 21:45–:49.   This is the only time Roberson was ever expressly told he did not need to sign the form.

voluntary—this reasoning applies equally to the information on his cell phone.  Cf. Def.'s Mot. at 31 (asserting that Roberson "[felt] that he had no choice[] because his will was overborne" when he signed the form).

At the suppression hearing, Roberson again claimed that he "didn't know what [the form] was" and that he could "not understand[] the words" on the form.  Tr. 48:22–49:2.  Neither claim sways the Court.  A defendant's mere failure to read a consent form when he had ample opportunity to do so does not invalidate the resulting consent.  See United States v. Triana, 760 F. App'x 768, 770, 772–73 (11th Cir. 2019) (consent to search was voluntary even though defendant was not told he could refuse and did not understand written consent form where officer explained the form in defendant's native language); United States v. Webb, Crim. A. No. 09-00233-KD-B, 2010 WL 32236, at *1 (S.D. Ala. Jan. 4, 2010) (upholding consent to search when it was uncontested that defendant did not read the consent form because "there is no evidence . . . that the agent prevented [defendant] from thoroughly reviewing the documents before [defendant] elected to sign them"); United States v. Ramsey, Crim. A. No. 19-268, 2020 WL 2220312, at *3 n.3 (E.D. Pa. May 6, 2020) (upholding consent to search even though defendant claimed he did not read the form because nothing "leads the Court to conclude that [defendant] was in a position where he could not read the forms if he chose to do so").  Here Roberson was not only given the chance to read the form but was actively encouraged to do so both before and after he signed it.

Defendant's alleged lack of understanding is also unsupported by the record.  Roberson asked several questions about the specifics of the search, had it thoroughly explained to him, and was actively involved in the process.  It is unlikely that someone who either had no idea what was happening or who had involuntarily consented would affirmatively volunteer to unlock his phone for the purposes of the search.  See Int. 1 at 32:17–:25.  Roberson also correctly summarized the meaning

of the consent form in Interview 3, see Int. 3 at 1:20:24–:28, and he declined to withdraw his consent despite being presented with several implicit and explicit opportunities to do so.

Considering the totality of the circumstances, including the way in which the agents sought his consent, Roberson's active engagement in the search itself, his later demonstrations of comprehension, and his refusal to revoke his consent, the Court finds that the evidence gleaned from Roberson's phone was not involuntarily compelled.

## V.   **Interview 4**

The fourth and final interview at issue took place on February 25, 2021, nearly two years after the 2019 Interviews.  Def.'s Mot. at 7.  Following Roberson's indictment on the present charge in February 2021, he surrendered to the authorities on the morning of the 25th,[30] and at around 10:30 AM, he was brought to an interview room for an interview with Abruzzese and MPD Detective Tom Sullivan.  See Int. 4 at 4:00–:10.[31]   All three men were dressed in plain clothes, id., and though the officers had their badges visible, neither was armed, id.; accord Tr. 25:4–8.  Roberson was brought into the room in handcuffs, but these were promptly removed.  Int. 4 at 4:10–15.  When the officers indicated that they might need to shackle Roberson to the floor, Roberson joked that he is "not a runner" and "not too fast," prompting laughs and reciprocal jokes from both officers.  Id. at 4:16–:32. Roberson remained unrestrained during the entire interview.[32]   After asking standard background questions about his address, phone number, etc., Abruzzese explained to Roberson that he had been

---

[30] Roberson discussed his surrender with the officers during the interview, Int. 4 at 4:55–5:15, and he testified on cross-examination that he "turned himself in," Tr. 87:10–11.  Nonetheless, Roberson also suggested at the hearing that he was apprehended by a "bounty [h]unter," id. at 88:11–12, and that he had spent time in the "back of an officer['s] car" that morning, id. at 54:16–17.  Although the Court cannot disprove either of these claims, Abruzzese testified that Roberson was transported to the police station by "[a] friend," id. at 24:24, and there is no indication that Roberson was ever involuntarily detained prior to his arrival at the station that morning.

[31] The parties submitted both an audio and video recording of Interview 4.  See Def.'s Mot. App'x 4.  All citations to "Int. 4" are to the video recording of the interaction.

[32] To the extent defendant stated otherwise at the suppression hearing, see Tr. 87:14–19, 88:6–15, his testimony is squarely disproven by the video recording of this interview.

indicted by a federal grand jury and was under arrest.  Id. at 7:50–9:30.  Abruzzese then asked Roberson if he and Sullivan could ask him some questions, and, although initially reluctant to rehash their prior conversations because "the answers [will] remain the same," id. at 9:45–10:00; accord Tr. 26:3–6, Roberson eventually agreed to speak to Sullivan about some of the detective's other investigations.

At this point, Abruzzese explained that, because Roberson was under arrest, Abruzzese needed to read him his rights.  Int. 4 at 11:10.  After confirming that Roberson was "understanding what [Abruzzese was] saying" and that he was under the influence of neither medication nor alcohol, id. at 11:19–27, Abruzzese read the following warnings from a form:

> You have the right to remain silent. Anything you say can be used against you in a court of law or other proceedings. You have the right to consult with an attorney before making any statement or answering any questions. You have the right to have an attorney present with you during questioning. If you cannot afford an attorney, one will be appointed for you before any questioning if you wish. If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purposes of consulting with [an] attorney.

Id. at 11:28–:59; Def.'s Mot. App'x 3.  Abruzzese then went a bit off-script: "So if I asked you a question, and you're like, 'I don't want to answer that'?  Fine.  Move on to the next question."  Int. 4 at 11:58–12:06: Def.'s Mot. App'x 3.

Throughout the reading of his rights, Roberson was generally attentive: although his eyes wandered briefly, he primarily looked in Abruzzese's direction and may have tried to read along with Abruzzese's recitation of his rights.  Int. 4 at 11:28–12:06.  After finishing the warnings, Abruzzese paused and looked up at Roberson, who nodded his head twice.  Id. at 12:05.  Abruzzese then asked, "So with that being said, can [Sullivan] ask you some questions about his case and kind of what's going on?"  Id. at 12:06–:13.  Roberson quietly said "yes, sir," before turning to face Sullivan, who began questioning him.  Id. at 12:12–:15.

After around an hour of friendly questioning by Sullivan regarding Roberson's work history and dance groups, the conversation returned to his incriminating email messages.  Id. at 1:13:49. Roberson actively engaged with Abruzzese's questions on this topic.  On the recording, he appears relatively comfortable, if somewhat combative as the officers confronted him with evidence contradicting his story—at one point Roberson accused the officers of "trying to get [him] to say something so you guys can persecute me."  Int. 4 at 1:16:05–07.  Shortly thereafter, Abruzzese and Sullivan expressed their view that Roberson was not being honest, and they urged him to be truthful with them, including once by reference to Roberson's religious faith.[33]  A few minutes later, Roberson admitted to having "tried it," "it" referring to the "child sexual abuse videos," Int. 4 at 1:22:30–:55, but that he had stopped and is disgusted by those videos and the abuse they depict, id. at 1:23:30–:25:00.  He then discussed his calling to be a preacher, animatedly telling the officers how he felt he was able to help young people in that role.  Id. at 1:25:15–:26:15.

Not long afterwards, the officers told Roberson that they were "done today," and Roberson, facing the prospect of returning to the holding block, began crying, asking to see his mother, and specifically asking Abruzzese to talk to the judge in order to ensure he is released.  Id. at 1:36:10–:38:00.  Abruzzese then placed a Miranda waiver form—the same form from which he had read the warnings—in front of Roberson.  Id. at 1:37:30–:40.  Gesturing to the form with a pen, Abruzzese said "I read you your rights at the very beginning of the interview—all I want you to do is print your name and sign your name."  Id. at 1:37:51–38:00.  Roberson, still crying and asking Abruzzese to talk to the judge on his behalf, signed the form;[34] while Roberson was writing his name, Abruzzese,

---

[33] Abruzzese asked whether, when Roberson becomes a preacher, he would preach about truthfulness.  When he responded in the affirmative, Abruzzese told him that he should practice what he preaches.  Int. 4 at 1:20:12–:24.

[34] The signed form was attached to Roberson's motion to suppress as Appendix 2.  Abruzzese signed the form after Roberson, Int. 4 at 1:38:35–:50, and Sullivan served as the other witness, signing the form before Roberson, Int. 4 at 1:37:08–:23.

somewhat agitatedly answered that he would "do what he can" but "[did not] want to lie to you . . . and giv[e] you false information."  Id. at 1:38:00–:10.  Abruzzese took Roberson's fingerprints and a DNA sample, and, after approximately an hour and forty minutes in the interview room, Sullivan escorted Roberson back to the holding cell for processing.  Id. at 1:43:40.

### a. **Voluntariness**

As with the 2019 Interviews, Roberson contends that his statements during Interview 4 were involuntary and thus inadmissible against him.  See Def.'s Mot. at 2–3.  But, also as with the 2019 Interviews, he offers little in support for his claim.  In his motion, Roberson submits that his statements were involuntary because he was in handcuffs immediately before the interview, he was told he was under arrest, and the interview lasted around one hundred minutes.  See Def.'s Mot. at 14.  These three factors are likely present in the vast majority of post-arrest interrogations—those facts alone, then, surely do not constitute the "egregious facts" necessary to support a finding of involuntariness.  Otherwise, most post-arrest interrogations would violate the Due Process Clause.

At the suppression hearing, Roberson again painted a picture of fear and panic, stating that he was scared he would be brutalized by the agents (a fear based solely on reports of police brutality on the news) and that he was crying and begging for his mother.  E.g., Tr. 54:15–56:9.  There is no corroboration of this fear or panic in the recording—on the contrary, the first hour of the conversation was congenial, closely resembling the tone of the 2019 Interviews, and Roberson maintained a loose, joking affect throughout the encounter.[35]  Indeed, Roberson repeatedly brought up the incriminating

---

[35] E.g., Int. 4 at 4:16–:32 (Roberson joking that he didn't need to be shackled because he "[is] not too fast fast"); id. at 21:45–28:40 (Roberson discussing his various youth dance programs, including animatedly telling several stories about his students to Sullivan); id. at 29:10–:19 (Abruzzese, about Roberson's statements about his dance program: "It's actually refreshing to hear somebody tell good stories." Roberson, laughing: "That's a real story, that's not a 'good story'!" Abruzzese: "No, I'm talking about being inspirational to other people, that's what I meant."); id. at 31:35–:42 (Abruzzese: "Hopefully, Michael, this is just a bump in the road for you and you'll get over it and it move on with your life.").  One exchange particularly indicative of the nature of the interview came around forty minutes in, when Roberson and the officers engaged in a casual but spirited debate regarding COVID-19 vaccines.  Id. at 36:35–38:20.

emails and his prior conversations with Abruzzese without any prompting, see Int. 4 at 30:50–31:15, 32:42–33:25, which is highly suggestive of voluntariness, see Hallford I, 816 F.3d at 859 (finding statements voluntary in part because defendant made "unsolicited" admissions and "volunteered . . . information when no question was pending").

To the extent Roberson argues his statements in Interview 4 were involuntary because the officers knew that Roberson "had been abused [and] has a disability, anxiety, depression, and attention deficit hyperactivity disorder," the Court disagrees.  Def.'s Mot. at 12.  Roberson offers no explanation for how past abuse interfered with his ability to competently speak to law enforcement, nor has he presented any evidence that he was suffering from any mental ailments at the time of this interview.  And even assuming these conditions were present and the agents knew about them, nothing in Interview 4 amounted to egregious or coercive conduct proscribed by the Fifth Amendment.

To be sure, the final half hour of Interview 4 was the most tense and antagonistic of any of Roberson's interactions with Abruzzese (though that is not a terribly high bar).  See generally Int. 4 at 1:14:15–:32:50.  Both Abruzzese and Sullivan were asking Roberson questions, and for several minutes they urged him to tell the truth, a tactic that culminated in some of Roberson's most incriminating statements.  But the Fifth Amendment does not require that criminal defendants never be uneasy during interrogation.  The officers never threatened or physically intimidated Roberson in any way, nor was he "deprived of any essentials," Hughes, 640 F.3d at 438—indeed, when Roberson began coughing in the middle of the interrogation, Sullivan stopped his questioning to ask if he was alright and offer him water, Int. 4 at 1:32:05–:10.

The officers' questions, freighted though they may have been, did not constitute egregious conduct critically impairing Roberson's capacity for self-determination.  See Berghuis, 560 U.S. at 386–87 ("The fact that [the officer's] question referred to Thompkins' religious beliefs also did not

render Thompkins' statement involuntary."); <u>Harris</u>, 2021 WL 1167263, at *2 (finding that officers' suggestion that defendant would be separated from his children for many years if he did not promptly confess "without more, does not approach the high threshold required for a finding of egregious police activity" and noting that these comments, "while certainly an emotional appeal, do not demonstrate evidence of improper coercion"). And while Roberson did start crying and asking for his mother, he did so only <u>after</u> the substance of the interview was complete—that Roberson became emotional when confronting the reality of his arrest says very little about the voluntariness of his earlier statements. Moreover, after a few minutes of crying, Roberson regained his composure enough to repeatedly apologize both for his behavior in the interview and for sending the incriminating emails. Int. 4 at 1:39:08, 1:40:45, 1:42:00. In short, there was nothing extraordinary—and certainly nothing "egregious"—about either the conditions or the content of this interview. The Court therefore concludes that Roberson's statements were voluntary.

### b. Waiver

On a different tack, Roberson raises two challenges to the validity of his waiver of rights in Interview 4.[36] Assessing a purported <u>Miranda</u> waiver requires the court to answer three questions: 1) did the defendant waive his rights?; 2) did he do so voluntarily?; and 3) did he do so knowingly and intelligently?. The government must prove each of these three elements by a preponderance of the evidence. <u>See</u> <u>Connelly</u>, 479 U.S. at 168; <u>Harris</u>, 2021 WL 1167263, at *3. Both of Roberson's contentions are best understood as claims that his waiver was not made "knowingly and intelligently." The Court will thus briefly address the first two questions before analyzing the "knowingness" of the waiver.

---

[36] There is no dispute—nor could there reasonably be—that Interview 4 constituted a "custodial interrogation" which implicated the full range of <u>Miranda</u> protections.

34

i.   Implied Waiver

Waiver may be explicit or implicit, and a voluntary statement after hearing and understanding one's Miranda rights constitutes a "course of conduct indicating waiver" sufficient to render subsequent statements admissible. See Berghuis, 560 U.S. at 386 (quoting Butler, 441 U.S. at 373); accord id. at 388–89 ("[A] suspect who has received and understood the Miranda warnings, and has not invoked his Miranda rights, waives the right to remain silent by making an uncoerced statement to the police.").

Berghuis is dispositive as to Roberson's implicit waiver in Interview 4.  In that case, the defendant was subjected to nearly three hours of questioning during which he was essentially silent, giving only "a few limited verbal responses . . . such as 'yeah,' 'no,' or 'I don't know.'"  Berghuis, 560 U.S. at 375.  He then responded "yes" to three queries relating to his religious beliefs, including the question "Do you pray to God to forgive you for shooting that boy down?"  Id. at 376.  These three statements, the Court held, were "sufficient to show a course of conduct indicating waiver."  Id. at 386.  Here, the facts are not nearly so extreme.  Immediately after receiving his warnings, Roberson was asked "with that being said, can [Sullivan] ask you some questions?," to which he responded in the affirmative.  Int. 4 at 12:07–:12.  Roberson then proceeded to have a free and friendly conversation with the officers for nearly an hour.  If a few syllables after three hours of near-total silence was a sufficient "course of conduct indicating waiver" in Berghuis, then surely an hour of enthusiastic responses immediately after hearing the Miranda warnings suffices as well.

ii.   "Voluntarily"

The voluntariness of a Miranda waiver is assessed just like the voluntariness of any other statement. See Connelly, 479 U.S. at 169–70; United States v. Clarke, 611 F. Supp. 2d 12, 31 (D.D.C. 2009) ("The standard for the voluntariness of a Miranda waiver is the same as the standard for

voluntariness of a confession."). In this case—in which Roberson's statements over the course of the conversation <u>are</u> his implicit waiver—the Court's previous determination that those statements were not involuntarily compelled suffices to show that Roberson's waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." <u>Moran</u>, 475 U.S. at 421.

### iii. "Knowingly and Intelligently"

Roberson raises two arguments with respect to the "knowing-ness" of his waiver. First, he contends that Abruzzese's off-script comment regarding his right to "move on to the next question" was so obfuscatory as to render the warnings fatally deficient. Def's Mot. at 27.[37] Second, Roberson contends that he subjectively did not understand his rights when he waived them, and in particular that he "did not know that his statements would be used against him." Def.'s Mot. at 30.

There is "no talismanic incantation . . . required to satisfy [<u>Miranda</u>'s] strictures," <u>California v. Prysock</u>, 453 U.S. 355, 359 (1981)—rather, the warnings must only "reasonably 'convey to a suspect his rights as required by <u>Miranda</u>,'" <u>Duckworth v. Eagan</u>, 492 U.S. 195, 203 (1989) (cleaned up) (quoting <u>Prysock</u>, 453 U.S. at 361); <u>accord</u> <u>Florida v. Powell</u>, 559 U.S. 50, 59–60 (2010). Roberson contends that his <u>Miranda</u> warning in Interview 4—and in particular the comment to the effect that if Roberson "did not want to answer" a question, then they could "move on to the next question," Int. 4 at 11:58–12:06; Def.'s Mot. App'x 3—was "ambiguous" and "not a correct statement of law" because it "implied that questioning would continue[] if Roberson did not want to answer a question," Def.'s Mot. at 27, 33.

---

[37] It is not clear quite where such a claim should go in the three-pronged waiver inquiry. Arguably, the provision of deficient warnings is equivalent to providing no warnings at all, suggesting that the adequacy of the warnings should be treated as a threshold question. <u>Cf.</u> Ronald J. Allen et al., <u>Comprehensive Criminal Procedure</u> 859 (2d ed. 2005) ("If the required warnings have not been given, <u>Miranda</u> waiver is impossible; the presumption of police coercion is irrebuttable."). But as defendant's challenge to Abruzzese's comment relates primarily to its potential to "obfuscate[]" and confuse Roberson, <u>see</u> Def.'s Mot. at 27, the Court analyzes it under the "knowingly" prong.

Had Abruzzese actually said what Roberson interprets his comment to have meant, it would pose a non-frivolous question regarding the adequacy of the warnings. But Roberson's understanding is not the best interpretation of Abruzzese's statement. Rather, the agent's comment indicated not that Roberson had the right <u>only</u> to move from one question to the next but instead that he had that right <u>in addition</u> to the right—articulated immediately beforehand—to stop the interrogation altogether. There is some authority suggesting that interviewees <u>do</u> possess the narrower right to refuse to answer only certain questions, in which case there would have been nothing incorrect about Abruzzese's statement. <u>See</u> <u>United States v. Medunjanin</u>, 752 F.3d 576, 587 (2d Cir. 2014) ("[A] person who wishes to enjoy his constitutional protection against self-incrimination must invoke the privilege—either generally <u>or vis-à-vis a specific question</u>—at the time he is asked to respond or make a statement." (emphasis added)). And if the Fifth Amendment does <u>not</u> protect an interviewee's ability to invoke a limited right to silence, then Abruzzese was allowing Roberson <u>greater</u> flexibility during this interview than the constitutional minimum. Such an allowance cannot mandate suppression of the subsequent statements. The Court accordingly holds that the warnings Roberson received in Interview 4 "reasonably 'convey[ed] . . . his rights as required by <u>Miranda</u>.'" <u>Duckworth</u>, 492 U.S. at 203 (quoting <u>Prysock</u>, 453 U.S. at 361).

This leaves only Roberson's claim that, in effect, he did not possess "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it" when he voluntarily agreed to speak to the officers. <u>Moran</u>, 475 U.S at 421. Roberson submitted in his motion that he "did not understand that his statements would be used against him," Def.'s Mot. at 30, and he repeatedly testified at the suppression hearing that he did not understand any of his rights even after receiving his warnings. Tr. 52:16–53:24.

This is a close question due to the dearth of contemporaneous evidence of Roberson's understanding. Roberson never verbally indicated that he understood his rights, nor did he sign a

statement to that effect until <u>after</u> questioning had ceased, ninety minutes after he received the warnings.  As explained above, the burden is on the government to demonstrate understanding, and the Supreme Court has specifically stated that it is <u>not</u> sufficient to show merely that the defendant heard his <u>Miranda</u> rights and then made an uncoerced statement.  <u>Berghuis</u>, 560 U.S. at 384.  For the reasons below, however, the Court finds that the government has shown that it is more likely than not that Roberson understood his rights (and thus made a knowing waiver) at the beginning of Interview 4.

At the outset, the Court does not credit Roberson's testimony at the suppression hearing that he did not understand his rights when they were read to him.  Roberson's testimony is shot through with inaccuracies and exaggerations, all of which happen to inure to the benefit of his suppression arguments.[38]  This is particularly the case with Interview 4: nearly every detail Roberson provided about February 25, 2021 was incorrect.  The Court has previously noted the inaccuracy of Roberson's statements that he was in handcuffs during the interview, <u>supra</u> note 32, and that he was apprehended by a bounty hunter or by the police, <u>supra</u> note 30.  Roberson further erroneously testified that he was not asked if he was on prescription medications, Tr. 61:10–15; <u>but see</u> Int. 4 at 11:20–:26; that Abruzzese did not tell him he was under arrest or read his <u>Miranda</u> warnings until the very end of the interview, Tr. 88:16–89:7; <u>but see</u> Int. 4 at 11:08–12:15; and that, when he did receive his <u>Miranda</u> warnings, he was in tears and asking for his mother, Tr. 52:22–53:11; <u>but see</u> Int. 4 at 11:25–12:15.  Furthermore, when the government's attorney confronted Roberson with evidence contradicting his statements, Roberson suddenly "d[id]n't remember" much of anything from Interview 4.  Tr. 89:21–

---

[38] <u>See</u> <u>supra</u> notes 6, 11, 12, 14, 18, 23 and accompanying text.  Other moments from the suppression hearing that inform the Court's assessment include defendant's statement that he "maybe probably" had been drinking during Interview 3, <u>see</u> <u>supra</u> note 27; Tr. 60:15, and his long back-and-forth on cross-examination about his "ab[ility] to make rational decisions" or "use reason," Tr. 58:6–59:12.  Both exchanges suggest that Roberson's first priority at the hearing was not to admit <u>anything</u> that might harm the chances of his motion.  The vehemence with which Roberson fought these simple statements of fact further weakens his credibility with the Court.

91:16. These demonstrable inaccuracies combine with the Court's assessment of Roberson's live-by-videoconference testimony to inform its credibility determination. The result is that the Court puts essentially no stock in Roberson's post hoc statements that he did not understand his rights.

Discounting Roberson's testimony, however, does not excuse the government from its burden—just because Roberson has not credibly shown that he did <u>not</u> understand his rights does not mean the government has shown that he <u>did</u>. The prosecution must show that, in the totality of the circumstances, it is even slightly more likely than not that Roberson understood his rights when he waived them. The government has met this burden, thanks to the following facts: 1) Roberson understands English; 2) he was not mentally impaired at the time he waived his rights; 3) he nodded after Abruzzese finished reading the warnings; 4) he answered affirmatively when asked "with that being said, can he ask you some questions . . . ?;" and 5) he signed a statement acknowledging his understanding ninety minutes after his implicit waiver. None of these considerations would necessarily be enough to establish a knowing waiver on its own, but, in light of the absence of credible evidence to the contrary, the Court finds that, together, they demonstrate that it is more likely than not that Roberson understood his rights when he waived them.

First and most obviously, Roberson is a native English-speaker, and, based on the Court's review of the interviews at issue, he exhibits no defects in understanding or responding in his native language. As he demonstrated at the suppression hearing, Roberson fluently speaks and comprehends English. There are also no indications that Roberson was mentally impaired or suffering from any "disability," Tr. 91:2–5, at the time that he waived his rights. He had a normal conversation with the agents prior to hearing his rights and initially put up mild resistance to discussing the incriminating emails, Int. 4 at 9:45–:55, suggesting that he was able to focus and think critically about his situation. He also verbally confirmed that he was "understanding what [Abruzzese] was saying" immediately prior to hearing his rights. <u>Id.</u> at 11:19–:23. And after receiving his warnings, Roberson coherently

responded to the officers' questions for the better part of an hour.  Specifically, Roberson appears to have paid attention to Abruzzese's recitation of the <u>Miranda</u> warnings.  Though not making eye contact with the agent (unsurprisingly, since Abruzzese was reading from a form and thus not looking at Roberson) and glancing around the room once, Roberson generally looked in the agent's direction, and, based on the video recording, he may have even tried to read along with Abruzzese's recitation.  <u>See</u> Int. 4 at 11:27–12:08.  To the (concededly limited) extent a video can evince attentiveness or concentration, the recording of Interview 4 shows that Roberson was engaged with Abruzzese during the recitation of his rights.

After Abruzzese finished reading Roberson his rights, he paused and looked up at him.  Int. 4 at 12:05.  Roberson made eye contact with Abruzzese and then nodded his head twice.  Nodding one's head, especially in response to a statement rather than a direct question, is inherently ambiguous,[39] and the Court hesitates to ascribe definite meaning to this gesture based only on a video recording in which only half of Roberson's masked face is visible.  That does not mean, however, the Court cannot ascribe <u>any</u> meaning to it.  A nod is a sign of affirmation rather than negation, and it cannot plausibly be construed as a sign of confusion or hesitation.  If Roberson was trying to convey either of those feelings to Abruzzese, the Court is confident that he would <u>not</u> have done so by nodding his head.  And although Abruzzese's post hoc reflections are far from ironclad evidence of Roberson's subjective understanding, the agent testified that he perceived Roberson to have "indicated [that] he understood."  Tr. 26:3.

It is possible that Roberson, even after hearing clear <u>Miranda</u> warnings, did in fact misunderstand the nature of one or more of his rights—in other words, he might have nodded <u>thinking</u>

---

[39] <u>Cf., e.g.</u>, <u>Koh v. Ustich</u>, 933 F.3d 836, 846 (7th Cir. 2019) (holding that it was not reasonable for an officer to interpret a nod as indicating understanding of his rights when the Korean-speaking interviewee later asked for a translation of the warnings: "any prior nodding [was] more likely a polite acknowledgment that he was listening to what the speaker was saying rather than affirming [his understanding]").

he understood while, in reality, he misperceived his rights.  Indeed, Roberson seemed to suggest this as an alternate theory at the suppression hearing.  See Tr. 91:1–2.  But courts, including this one, are reluctant to allow a defendant's after-the-fact claims of misunderstanding to overcome contemporaneous indicia of comprehension.  See, e.g., United States v. Figueroa-Serrano, 971 F.3d 806, 815–16 (8th Cir. 2020) (holding that defendant's "testimony . . . that he did not understand the rights he waived . . . does not overcome the record which shows that [defendant] promptly and coherently answered [the officer's] questions and gave no reason for [the officer] to believe that he did not understand the nature of the interrogation").  Indeed, the Sixth Circuit has repeatedly held that courts should assess a waiver "primarily from the perspective of the police, such that where the police had no reason to believe that the defendant misunderstood the warnings, . . . there is no basis for invalidating the Miranda waiver."  United States v. Ramamoorthy, 949 F.3d 955, 965 (6th Cir. 2020) (cleaned up) (quoting United States v. Al-Cholan, 610 F.3d 945, 954 (6th Cir. 2010)); accord Garner v. Mitchell, 557 F.3d 257, 263 (6th Cir. 2009) (en banc) (establishing this rule).  Thus, while Roberson's nod following the recitation of his rights does not conclusively establish his subjective understanding of his rights, the Court is reluctant to allow retrospective claims of confusion to contradict this otherwise clear signal of affirmation.

The Court also finds Roberson's agreement to speak with Sullivan relevant in gauging Roberson's understanding of his rights.  Although merely "ma[king] an uncoerced statement" after "a Miranda warning was given" is not enough to show valid waiver, Berghuis, 560 U.S. at 384, the Court notes the specific phrasing of Abruzzese's question: "So with that being said, can he ask you some questions about his cases and kind of what's going on?"  Int. 4 at 12:06–:13 (emphasis added).  The prefatory clause "with that being said" ties the substantive question ("can he ask you some questions about his cases?") to the immediately preceding recitation of Roberson's rights.  Although Roberson's response to this question primarily signified his willingness to talk (i.e. the waiver of his

rights), Abruzzese's preface means that Roberson's affirmative response also indicated (obliquely) a decision to speak with the foregoing rights in mind, i.e. that he waived his rights knowingly.

Finally, after the interrogation (and so approximately ninety minutes after he heard and waived his rights), Roberson signed a waiver form stating that he "ha[s] read, or someone has read to me, this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." Def.'s Mot. App'x 2; see also Int. 4 at 1:37:40–:38:10.  Roberson knew when he signed this form that it related to his Miranda rights: Abruzzese gestured at the form and said, "I read you your rights at the very beginning of the interview," Int. 4 at 1:37:50–:54, and Roberson had likely seen the form earlier when Abruzzese read from it.  Abruzzese did not fully explain what Roberson's signature would signify, but he did not stop Roberson from reading the form and gave no indication that Roberson had to sign even if he did not agree with the form's statements. See id.  To be sure, this after-the-fact signing is far from a clear indication of Roberson's understanding ninety minutes earlier.  The form is written in the present tense and most naturally conveys the signatory's current (rather than past) state of mind, and Roberson may not have been fully aware of what he was signing due to his emotional state and his continuing conversation with Abruzzese.  But the Court must assess the totality of the circumstances, and it finds that Roberson's post-interrogation signature acknowledging that he understood his rights has some bearing on whether Roberson waived his rights knowingly.

The Supreme Court's holding in Berghuis v. Thompkins is also critical for assessing whether the government has met its burden here.  In that case, the Court found a knowing waiver of rights where: 1) Thompkins received a written copy of the Miranda warnings; 2) the interrogating officer determined that Thompkins could read and understand English; 3) Thompkins was given time to read the printed warnings; 4) at the officer's prompting, Thompkins read the fifth warning aloud; and 5)

42

the officer then read the other four warnings aloud.[40]  Berghuis, 560 U.S.  at 373–75, 385–86. Berghuis thus demonstrates that the knowingness of a waiver may be inferred from circumstances alone and that the government need not show a contemporaneous indication of understanding in order to meet its burden.

This case and Berghuis have approximately the same quantum of evidence supporting the defendant's knowing waiver.  Whereas Thompkins (unlike Roberson) received the warnings twice, Roberson (unlike Thompkins) gave some affirmative sign that he understood his rights prior to waiving them.  And whereas Thompkins was silent for the nearly three hours between his warnings and waiver, Roberson began to speak freely with the officers immediately after hearing his rights.  As such, if "[t]here was more than enough evidence in the record to conclude that Thompkins understood his Miranda rights," Berghuis, 560 U.S. at 385, then there is also surely enough evidence supporting the same conclusion here.[41]

It is worth clarifying what the Court does not hold.  It does not hold that a non-impaired English speaker who receives Miranda warnings is presumed to understand them when he subsequently speaks to police—such a presumption is foreclosed by Berghuis, Tague, and the long-established principle that the government bears the burden to show a valid waiver.  Nor does the Court hold that merely agreeing to speak with officers may establish both a defendant's waiver and his understanding of those rights.  Instead, the Court holds merely that, considering the totality of the circumstances in this situation, it is more likely than not that this defendant understood his rights

_____

[40] Thompkins declined to sign a waiver form indicating that he understood his rights, and the Court did not consider the "conflicting evidence" about whether Thompkins verbally confirmed his understanding.  Id. at 375.  The above facts were all the Court relied on in finding a knowing waiver.

[41] The Court notes that the government would handily have satisfied its burden had Abruzzese or Sullivan taken one of any number of steps, many of which are common practice in police departments.  These include asking Roberson whether he understood his rights; otherwise soliciting a verbal indication of his comprehension; having Roberson read and sign the waiver form before questioning; or even specifically telling him that signing the form after the interrogation signified that he understood his rights when they were read to him.

when he voluntarily chose to speak to Abruzzese and Sullivan.  That finding is sufficient to deny defendant's motion to suppress his statements during Interview 4.

## Conclusion

For the foregoing reasons, the Court will deny Roberson's motion to suppress in full. Roberson's statements in all four interviews were voluntary; none of the 2019 Interviews were "custodial interrogations" requiring the recitation of Miranda warnings; Roberson's consent for the agents to search his phone was voluntary, and the evidence gleaned from that search was not involuntarily compelled; and, finally, Roberson voluntarily, knowingly, and intelligently waived his rights in Interview 4.  An Order to this effect will issue on this date.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated: November 15, 2021